UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 11 262 CW |
| Plaintiff, | ) | |
| | ) | DETENTION ORDER |
| v. | ) | |
| | ) | |
| TAWFIK NAGY MOHAMMED ALI, | ) | |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

A grand jury in the Northern District of California charged defendant Tawfik Ali with drug offenses carrying a maximum sentence of at least ten years under the Controlled Substance Act. The specific charge is possession with intent to distribute cathinone in the form of Catha Edulis, which is commonly known as khat.  The grand jury also charged him with threatening to murder two different federal agents on January 11, 2011.   Following several detention hearings, and for the reasons stated on the record and in this order, the court detains Mr. Ali and finds that no condition or combination of conditions in section 3142(c) will reasonably assure his appearance in this case or the safety of any other person or the community.

## II.  RELEVANT LEGAL STANDARDS

Under the Bail Reform Act, 18 U.S.C. § 3142, a court must order the release of a defendant

DETENTION ORDER
(CR 11 262 CW)

on a personal recognizance or unsecured appearance bond unless release on a bond alone will not reasonably assure the defendant's appearance or the safety of the community or another person. *See* 18 U.S.C. § 3142(b). If a court determines that release on a bond alone presents a risk of nonappearance or a danger to any person or the community, then the court must choose "the least restrictive further condition[s]" that will assure the defendant's appearance and the safety of the community or another person. *See id.* § 3142(c) (listing thirteen possible conditions of release and empowering the court to impose "any other condition that is reasonably necessary" to assure the defendant's appearance and the community's safety).

In evaluating whether conditions can be fashioned under section 3142(c) to reasonably assure the defendant's appearance and the safety of the community or another person, a court "shall consider" the factors in section 3142(g), including (1) the nature and circumstances of the offense, including whether the offense is one of certain enumerated crimes (including a controlled substance offense), (2) the weight of the evidence, (3) the history and characteristics of the person (including his job, financial resources, family ties, community ties, substance abuse history, physical and mental condition, character, criminal history, past conduct, track record in appearing court, and whether at the time of arrest the person was on supervision for parole, probation, or other release in a pending criminal case), and (4) the nature and seriousness of the danger to any person or the community posed by the person's release. *Id.* § 3142(g).

Under section 3142(f), the court holds an actual bail hearing only in certain cases, including on the government's motion in cases (like this one) involving crimes of violence or drug offenses involving a maximum sentence of at least ten years. *See id.* § 3142(f). At the hearing, the court determines whether any conditions in section 3142(c) will reasonably assure the defendant's appearance and the safety of the community or another person. *See id.* § 3142(f). The court must order a defendant detained if – "after a hearing pursuant to the provisions of subsection [3142](f)" – the court finds that conditions cannot be fashioned to assure the defendant's appearance in court or the safety of the community or another person. *See id.* § 3142(e)(1). For a drug offense like this one with a maximum prison term of at least ten years,

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of

DETENTION ORDER
(CR 11 262 CW)                    2

1   conditions will reasonably assure the appearance of the person . . . . and the safety of the
2   community.

*Id.* § 3142(e)(3).  The presumption shifts a burden of production to a defendant, but the burden

of persuasion remains with the government.  *See United States v. Hir*, 517 F.3d 1081, 1086 (9th

Cir. 2008).   The government must establish the risk of non-appearance by a preponderance of

the evidence, *see United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985), and it must

establish danger to the community by clear and convincing evidence, *see* 18 U.S.C. §

3142(f)(2)(B).

   The court generally must hold the detention hearing immediately at the defendant's first

appearance, but the government may continue the hearing for three days and the defense may

continue it for five days.  *See id.*  Further continuances are allowed only for good cause.  *See id.*

### III.  ADDITIONAL FACTS

   The grand jury returned the indictment here on April 21, 2011.  *See* ECF No. 1.  The

possession for sale count charges an unspecified amount of khat on January 7, 2011.  The threats

to murder the two agents were on January 11, 2011.  *See id.*

   The government's written motion for detention and oral proffers provide more context.  *See*

ECF No. 5.[1]  Mr. Ali's counsel also provided more context by proffer and through mental health

evaluations, declarations, and letters of support.  Not all of the facts are in this order.  The court

includes enough to give context to its decision.

### A.  **Khat Shipments**

   From February 2007 to January 2011, packages were mailed to Mr. Ali from different

locations including Great Britain, Kenya, China, Georgia, and Tennessee.  Some were

intercepted and seized.  Seized khat shipments ranged from 1.8 kilograms to 72.8 kilograms.

Most of the shipments went to Mr. Ali's mailbox at a commercial mailbox facility in Oakland.

   Agents began investigating the shipments.  When a package was delivered to the mailbox

---

   [1]  The court treats the facts in the memo as a proffer, which is how the court proceeds at a
detention hearing.  *See* 18 U.S.C. § 3142(f)(2) (defendant may present information at bail
hearing by proffer or otherwise); *United States v. Winsor*, 785 F.2d 755, 756-57 (9th Cir. 1986)
(defendant and government may proceed in a detention hearing by proffer or hearsay).

1   store, agents would confirm the distinctive odor of khat (and sometimes khat debris was visible

2   on the box). Then agents would observe Mr. Ali as he picked up the boxes, loaded them in his

3   car, and delivered them to various locations in the Bay Area. Between February 19, 2009 to

4   January 7, 2011, law enforcement agents observed Mr. Ali personally pick up boxes of suspected

5   khat approximately 19 times. The total weight of the shipments was 394.64 kilograms.

6   **B. Arrest on January 7, 2011**

7        On January 7, 2011, an ICE agent saw Mr. Ali pick up boxes from the mailbox store. He

8   previously had identified them as containing suspected khat based on the distinctive odor

9   emanating from the boxes. Mr. Ali's small daughter was with him, and apparently the boxes

10  were crowding her in the car. OPD officers also saw other vehicle code violations (like driving

11  at a high rate of speed and nearly striking a pedestrian). They stopped the car. Mr. Ali made

12  some statements (like the boxes were not his, he intended to return them to the postal store, and

13  the boxes contained henna). In fact, they contained 140 pounds of khat. Agents seized a $8,201

14  in cash and keys (including those to a storage facility that Mr. Ali delivered to previously, that

15  had another person associated with it, and that agents ultimately found contained three more

16  boxes of khat). After *Miranda* warnings, Mr. Ali eventually admitted that some of the product

17  was khat, that he had sold khat in 2007 and 2008, and that all Yemeni-owned stores sell khat.

18       According to defense counsel, Mr. Ali was cooperative and bailed out of state custody.

19  **C. Threats to Agents**

20       On January 11, 2011, ICE agents Jason Collins (also there on January 7) and Jeff Rhea went

21  to Mr. Ali's home to return personal items (including keys and debit cards) and conduct

22  surveillance. They arrived at 1:45 p.m., displayed their badges, and told Mr. Ali they wanted to

23  return the property. Mr. Ali asked about the seized $8,201 and his books. The agents explained

24  that those were evidence and were not being returned that day. They told Mr. Ali he would need

25  to sign a property receipt. Mr. Ali made a call, speaking Arabic. He then said he would not sign

26  anything. The agents told him that they would not be able to return the property unless he signed

27  the receipts. Mr. Ali then pointed at the agents, saying "you mess with my black book, you're

28  dead. You mess with my house, you're dead. You mess with my money, you're dead."

1    According to the government, "[b]ecause of the pending investigation, the agents decided to

2    terminate the encounter without placing Defendant under arrest."  ECF No. 5 at 6.

3        At subsequent hearings, defense counsel proffered the defense's theory that Mr. Ali did not

4    threaten the agents and basically said that Mr. Ali is excitable (but not dangerous) and does not

5    speak English well.  (The government proffered that Mr. Ali in fact speaks English and acts as a

6    translator for others sometimes.)

7    **D.  Continued Khat Shipments**

8        Apparently Mr. Ali closed his account at the mailbox store after he was released from state

9    custody after the January 7 arrest.  *Id.* at 5.  He received more shipments there though: one

10   package on January 21, two on January 29, three on February 2, two on February 4, and one on

11   February 10.  Another shipment was held at the U.S. Postal facility in Oakland.  After getting

12   federal search warrants, law enforcement confirmed that the boxes had khat.  On February 10,

13   2011, an unknown male picked up three boxes of khat addressed to Mr. Ali.  He drove them to a

14   gas station, where he met with Mr. Ali.  Agents approached, and Mr. Ali told them that he had to

15   pick the boxes up and planned to throw them away.

16   **E.  Search Warrant and Issues About Gun**

17       Around 6 a.m. (according to defense counsel) on January 25, 2011, agents executed search

18   warrants for Mr. Ali's home and car.   They found boxes of suspected khat and evidence of a

19   Chase Bank safety deposit box in Oakland (including two keys and a business card).  The box

20   number apparently is 1092.  Agents went to the bank and were told that Mr. Ali had earlier that

21   day asked to have access to the safety deposit box.  He did not have his key, and bank employees

22   told him that he would have to make an appointment to drill the box. Mr. Ali said to immediately

23   drill the box while he waited.  Bank employees did not, and Mr. Ali left.  According to the

24   government, agents got a search warrant and found a .38 caliber pistol, a loaded magazine, a box

25   of ammunition, and a Yemini passport.  ECF No. 5 at 6.  According to the defense. the

26   "passport" was actually his wife's and daughters' passports.

27   **F.  Initial Bail Study and Further Investigation**

28       At the first detention hearing, defense counsel proffered that Mr. Ali did not mean to threaten

anyone (as described above) and that Mr. Ali went to the bank at his former attorney's direction. That attorney specifically discussed the gun with Mr. Ali, told him to leave it alone (because it was his father's), directed him to get only his wife and daughters' passports, and ultimately told him to leave. Also in the record at this first hearing was Pretrial Service's first bail study recommending release on conditions that included a curfew and a $100,000 secured bond co-signed by sureties Abdu Alawi and Abdu Eissa. Among the factors that Pretrial Services noted were Mr. Ali's lack of criminal history, his long-term residence in the community, and his ability to reside with his wife and two minor children. Mr. Ali also has substantial community ties: during his many appearances, the entire courtroom was filled with his supporters.

Given these circumstances, the court observed that it ordinarily would fashion conditions of release in a khat-only case with a defendant with no criminal history, assets to post, and demonstrated familial and community support. But Mr. Ali acted erratically in court and appeared as if he were pretending not to understand English. Also, given the threats to the agents and what could be flight to the bank during a search warrant to get a gun, the court said that it would not consider releasing Mr. Ali without a mental health assessment and (essentially) a declaration from the prior attorney confirming the facts about going to the bank at the attorney's direction. (The court observed at more than one hearing that it was hard to determine whether Mr. Ali had mental health issues or language issues or was merely acting that way strategically.)

Defense counsel then did what the court asked. *See* Declarations/Documents, ECF No. 21.

As to the instructions from his prior lawyer, the short version is that Mr. Ali's attorney in the state case (Jose Fuentes) confirmed that he had talked with the AUSA before the search, knew about the case, and told the AUSA that Mr. Ali did nothing wrong. On the day of the search, Mr. Ali called him, very upset because of the 6 a.m. search and the trauma to his family. Mr. Fuentes called the AUSA and said that Mr. Ali would cooperate. He then called his client back and told him to go to the bank and see if they had a key so that he could retrieve the paperwork (which was identification paperwork – presumably passports – belonging to Mr. Ali's wife and daughters). He told him explicitly not to touch the gun, which (according to the defense)

belongs to Mr. Ali's father, who licensed that gun.  Mr. Ali called him, saying the agents were at the bank.  He told Mr. Ali to leave the bank and let the agents do their job.  Declaration of Jose Fuentes, ECF No. 21-2 to 21-4 ¶¶ 4-6.  A volunteer translator at the Asian Law caucus (who also has known Mr. Ali for twenty-five years) confirmed the conversation, as did Abdo Alawdi, one of the proposed sureties.  Declaration of Adel Somaha, ECF No. 21-1.

As to the mental health issues, Mr. Giller retained an expert, Dr. Fort.  Pretrial Services informed the court that Dr. Fort could do a satisfactory assessment.  He did one assessment and then supplemented it after the government provided additional information about the charged conduct, a jail call between Mr. Ali and his wife, and a prior threat by Mr. Ali in 2005.

As to the jail call, according to the government, there was a call on May 2, 2011, and Mr. Ali's wife told him to try to deceive the court by acting "crazy" so that he is "found not fit to stand" or words to that effect.  *See* Government's letter dated May 19, 2011.  She also mentioned that he should claim the charged khat as a personal use amount.  *See id.*  (For context, the court set or held detention hearings on April 28, May 6 (continued on paper to May 19), May 19, May 26, and June 6.  The court first addressed issues regarding mental health and access to the gun on April 28, 2011.)  On June 6, 2011, the defense proffered that it had someone else who could speak and understand Arabic, and they disagreed with the government's translation, saying that Mrs. Ali really said to let the court know what his health issues were.

As to the prior threat in 2005, apparently after being informed in November 2005 of a layoff at his old janitorial job, Mr. Ali told his work supervisor that "I will kill everyone and I don't care," pulling out a bag of medication and displaying it.  He also called his supervisor on December 31, 2005, and told her, "I will kill you."  (According to the defense, Mr. Ali filed a union grievance, the matter was settled, and Mr. Ali complied with a restraining order.)

The bottom line on the assessments is that Dr. Fort concluded that Mr. Ali had a personality disorder with antisocial features, a disorder that the court observes is not ordinarily amenable to treatment by medication or traditional insight-oriented (as opposed to cognitive-behavioral) therapy.  (Medication can be effective for treating co-occurring disorders like depression.)  Dr. Fort acknowledged danger, but he thought that the $500,000 secured bond proposed by the court

would address dangerousness, particularly because there had been no acts of violence.

**G.  Possible Property For Secured Bond**

As the facts suggest, at the beginning, the court thought that conditions of release might be fashioned, assuming that the defense could address the court's concerns about the threats to the agents and the trip to the bank to a safe deposit box that contained a gun.  The court had some discussion with the parties about the two proposed sureties: Abdo Alawdi and Abdu Eissa. Collectively, they had about $500,000 to secure a bond.

According to the government, Mr. Alawdi also is involved with Mr. Ali and may have taken over his khat operation.  (He may be the unknown person referenced above who picked up the khat after Mr. Ali was arrested on the state charges in January 2011.)   The court had some discussion with the government about – leaving aside any *Nebbia* inquiry into the provenance of the money – whether more money provided more of an incentive for Mr. Ali to comply with the terms of his supervision.  Put another way, the issue was whether $500,00 was better than $300,000, particularly given that Mr. Alawdi was not acting as a custodian.  Ultimately, the court determined that a co-signing surety also involved with khat did not provide the moral suasion that was appropriate for a surety.

That left Mr. Eissa as a potential surety. The equity in his property is about $300,000 rather than the $500,000 that the parties discussed originally.  Mr. Eissa also has a business (a Chevron gas station) that he estimates being worth about $700,000.   That meant that he had sufficient assets to be a surety for the full bond amount.

The other consideration is that – as discussed above – Mr. Ali had a room of supporters. Defense counsel proposed having those with jobs sign on the bond in various amounts sufficient to cover any amount the court might set.   While the government has taken a different view in different cases, the court believes that it has the authority to impose that sort of condition under 18 U.S.C. § 3142(c)(1)(B)(xiv)'s catch-all provision allowing imposition of "any other condition that is reasonably necessary to assure" the defendant's appearance or the community's safety, even without a Rule 46(e) affidavit establishing sufficient current assets.  In the past, the court has evaluated the co-signers' salary and earning potential, had them affirm the information in

1    court, and had them sign on the bond under section 3142(c)(1)(B)(iv)'s catch-all provision after

2    instructing them about the consequences of a default by the defendant.  This is an approach taken

3    by other courts in this district.  *See, e.g., United States v. Thomas*, 651 F.2d 2d 1083, 1085-86

4    (N.D. Cal. Apr. 29, 2009) (rejecting government's Rule 46(e) argument, noting significance of

5    co-signers' promises to pay a significant amount of money over time, and noting that other

6    federal courts throughout the country routinely apply this approach); *United States v. Powell*,

7    No. CR 10-00292 CW (DMR), ECF Nos. 18 (release order rejecting Rule 46(e) argument) and

8    41 (Judge Wilken affirmed release order); *United States v. Cruz*, No. CR. 09-01157 DLJ (LB),

9    ECF Nos. 24 (release order rejecting Rule 46(e) argument) and 30 (Judge Jensen affirmed

10   release).

**H.  Where Mr. Ali Would Reside Upon Release**

12        In the initial bail study, Pretrial Services recommended that Mr. Ali reside at his residence in

13   Oakland with his wife, two minor children, and father.  At a subsequent hearing, the government

14   informed the parties that the family had purchased one-way tickets back to Yemen and were

15   gone.  Defense counsel countered that culturally, Mr. Ali's wife cannot function here because

16   she cannot have male visitors (or presumably work), and Mr. Ali's father cannot perform that

17   patriarchal role because of his health.  The trip to Yemen – according to defense counsel – thus

18   is temporary until Mr. Ali gets out.  Also, the rent is still being paid at the house, a thirty-year-

19   old cousin is available to live with him, and Mr. Ali can live with the cousin in San Francisco

20   too.

**I.  Other Information**

22        The government points out that Mr. Ali has substantial ties to Yemen, travels there (most

23   recently in February 2008 for nine months), may have a house there, no longer has familial ties

24   here, and has no financial ties here given that he has not had a job (other than khat distribution)

25   since he lost his janitorial job in January 2007.

26        According to the bail study, Mr. Ali's friends say that he has been disabled for four years.

27   He has diabetes, high blood pressure, and high cholesterol.  He was on medication for depression

28   when he first went into custody, but according to his lawyer, his doctor discontinued the

DETENTION ORDER
(CR 11 262 CW)                          9

1  medication.

2      In addition to the community support manifested by the attendees at his bail hearings, Mr.

3  Ali submitted a letter signed by 57 members of his community.  That letter emphasized that he

4  was peaceful, kind, gentle, funny, and hard-working.  Essentially, defense counsel and Mr. Ali's

5  friends attribute the charged case on some level to cultural issues, his inability to speak English,

6  and health issues.

7                                    **IV.  DETENTION ORDER**

8      Following a hearing under 18 U.S.C. § 3142(f), and considering the factors set forth in

9  section 3142(g), the Court finds that no combination of conditions in section 3142(c) will

10  reasonably assure the defendant's appearance in this case and the safety of any other person or

11  the community.

12      Looking at the 3142(g) factors, in many ways, defense counsel satisfied the court's concerns.

13  Looking at the nature and circumstances of the offense, and some of Mr. Ali's characteristics

14  (like his community support, lack of criminal history, and ability to post a secured bond),

15  ordinarily, an alleged khat distributer like Mr. Ali would be released on bond.  This is not to

16  discount the seriousness of the offense, but ultimately, the court's bail inquiry is about flight risk

17  and the safety of the community.  And defense counsel did his due diligence to present a

18  narrative of an excitable man who did not in fact pose a danger to agents by his outbursts.

19  Beyond that, Mr. Ali's former attorney confirmed that he was not going to the bank during the

20  search warrant to get a gun.

21      This is not to say that at this point in the narrative, the court did not entertain reservations

22  still.  But the assets, the community support, the ability to reside at home with a loving family,

23  and a mental health assessment that somewhat assuaged concerns about danger meant that the

24  court at least entertained conditions like those recommended by Pretrial Services initially.

25      But as the fact narrative above shows, this is a case that only got worse at Mr. Ali's

26  successive bail hearings.  Mr. Ali acted out of control and erratically at his initial appearances.

27  Defense counsel attributed that to cultural issues.  Mr. Ali pretended not to understand English.

28  As the court told Mr. Ali, it is completely appropriate to ask for the assistance of an interpreter in

1    a serious case that is being conducted in a language other than your first language.  But the fact

2    record suggests that Mr. Ali probably speaks English pretty well and at least understands enough

3    based on his long time here to know what he was doing by his antics.  Then there was the jail

4    call with his wife.  The court understands that defense counsel's translator takes a different view

5    than the government's translator, but the overriding impression is that Mr. Ali was playing crazy

6    as a strategy in his criminal case.  This court was direct with Mr. Ali about how that was not a

7    good strategy to secure release.  By the end, Mr. Ali behaved much less erratically.

8         All of this is not to discount Mr. Ali's substantial community support, including the

9    willingness of his friend to pledge his house and business assets to secure Mr. Ali's appearance.

10   And the court is mindful of defense counsel's argument: Mr. Ali may be volatile and excitable,

11   but he is not dangerous, he has no history of violence, and he has a friend who will put his

12   financial future on the line for Mr. Ali.  Mr. Ali also bailed out of state custody in January.

13   Finally, it is important that the threats and trip to the safe deposit box were in January, and the

14   government did not indict until April.  If the government thought that Mr. Ali were a danger,

15   presumably it would have moved faster.

16        Still, the court is not convinced.  In large measure, this is due to Mr. Ali's in-court behavior,

17   which reflects either serious mental health issues in the form of a personality disorder or his

18   attempt to game the system to obtain a diagnosis that he is insane (or both).  Given the concerns

19   about violence (the threats and the bank trip), this does not give the court certainty that Mr. Ali is

20   not a danger.  On top of that, he no longer has financial or familial ties here, apparently moved

21   substantial amounts of khat (and confessed at least partly), has no other job, and has strong ties

22   to Yemen.  This poses a concern about flight risk and – particularly in the context of the erratic

23   behavior – the ability to abide by the conditions of release that the court might set.

24        A shorter way of saying this is that erratic behavior is not a situation conducive to

25   supervision by Pretrial Services.  Perhaps not surprisingly, Pretrial Services changed its

26   recommendation as the case unfolded and it learned more about risks relevant to Mr. Ali's ability

27   to comply with the conditions of his supervision.  It now recommends detention too.

28        Boiled down, the court's bail inquiry is about whether Mr. Ali is going to show up for his

DETENTION ORDER
(CR 11 262 CW)                    11

court appearances, comply with the conditions of his release, and not pose a danger to the community or others.  On this record, and in this presumption case, the court is not convinced that Mr. Ali can or will do what he is supposed to do.  The court orders him detained.

## V.  CONCLUSION AND APPEAL PROCEDURES

The Court detains the defendant as a danger to the community and as a flight risk.  The Court orders the defendant committed to the custody of the Attorney General or a designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or held in custody pending appeal.  *See* 18 U.S.C. § 3142(i)(2).  The defendant must be afforded a reasonable opportunity to consult privately with counsel.  *See id.* § 3142(i)(3).  On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility must deliver the defendant to the United States Marshal for a court appearance.  *See id.* § 3142(i)(4).

The court set the initial appearance on the district court's calendar on Wednesday, June 8, 2011, at 2:30 p.m.  To the extent that Mr. Ali wishes to appeal this court's detention order, this court's understanding of the district court's procedures is that he must file a formal appeal in writing to the district court.

IT IS SO ORDERED.

DATED: June 6, 2011

_____
LAUREL BEELER
United States Magistrate Judge

DETENTION ORDER
(CR 11 262 CW)                    12